Filed 1/22/14  P. v. Choi CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H036360 |
| Plaintiff and Respondent, | (Santa Clara County |
| | Super. Ct. No. CC893145) |
| v. | |
| JAY WON CHOI, | |
| Defendant and Appellant. | |
| | H038348 |
| In re JAY CHOI, | |
| On Habeas Corpus. | |

A jury convicted defendant Jay Won Choi, an orthodontist, of inflicting corporal injury (Penal Code § 273.5, subd. (a)(1)) on his wife, Hae Eun Choi (sometimes Wife), on January 11, 2008, and found him not guilty of exhibiting a hammer as a deadly weapon (Penal Code, § 417, subd. (a)(1)) on the preceding day.  The jury heard descriptions of the January 2008 incidents from Wife, defendant, and their older son,[1] who was seven years old during trial in June 2010.  The younger son was four years old in 2010 and did not testify.

---

[1] The couple gave their two sons distinctive names.  To preserve their privacy we will refer to them individually as the "older son" and "younger son."

After his conviction, defendant retained a new attorney (also defendant's appellate counsel) who brought a motion for new trial, arguing in part that the trial court had erred in excluding evidence from a handwriting analyst to show that Wife had lied at a deposition in the couple's dissolution proceedings. Defendant also argued that a competent trial attorney would have called defendant's mother as a witness and would have successfully asserted different theories of relevance to admit testimony by the older son's family therapist. Both witnesses would have testified to statements by the older son about what happened on January 11, 2008, and that Wife was violent with the children on other occasions.

After denying defendant's motions for a new trial and to reduce the conviction to a misdemeanor, the court suspended imposition of sentence for three years and placed defendant on formal probation with conditions including 94 days custody via electronic monitoring and completion of a domestic violence program. Wife asked for $1 million in victim restitution, primarily for psychotherapy, medications, and uncompensated labor over the course of the couple's marriage. The court ordered $4,970 to the victim compensation board and $805 in direct victim restitution.

On appeal defendant renews the three contentions made in his motion for new trial, arguing that he probably would have obtained a more favorable result at trial if the jury had heard the evidence described above that would have corroborated his testimony and impeached his wife. He makes these arguments independently on appeal and also asserts that the trial court erred in denying his new trial motion.[2] For the reasons stated below, we will affirm the judgment after concluding that the trial court did not err in excluding collateral impeachment or in denying the new trial motion, because it is not

---

[2] Defendant has also restated all these claims in a separate petition for writ of habeas corpus, which we address together with this appeal.

reasonably probable that the new evidence, to the extent admissible, would have changed the outcome of trial.

## I. TRIAL COURT PROCEEDINGS

### A. TRIAL TESTIMONY

Wife testified through a Korean interpreter. When asked on direct examination how Wife knew defendant, she first said, "He hit me." Then she explained that, as of January 2008, they had been married six years and had two sons. She testified that, on January 11, 2008, following an argument about their sons' nutrition, defendant punched, slapped, shook, stomped, and dragged her.

Defendant denied ever punching or kicking Wife. He testified that on January 11, 2008, he did physically deflect a violent attack by her on their younger son, who was then two years old. As for bruises evident in contemporary photographs, he described Wife as a dishonest, clumsy person who tends to fall down and bruise easily. She was prone to wearing heat patches called Salonpas to treat pains she frequently complained about.

Defendant is an orthodontist. An accountant in Los Angeles arranged for him to meet Hae Eun in San Jose. According to defendant, they dated for a year to a year and one-half before getting married. She spent part of that time in Korea. As is customary in Korea, her parents provided a dowry of $70,000 when she got married.

Two years after they married, Wife had a son, and three years after that she had another son. Their plan was that defendant would be the breadwinner of the family and Wife would take care of the children and not work outside the home. Defendant's mother lived with them. According to defendant, Wife did not fulfill their bargain, leaving his

mother[3] to be the primary caretaker of the children. Wife made little effort to get a driver's license and to learn English.

According to Wife, although defendant encouraged her to learn English, Mother kept her too busy with housework. Mother did most of the household errands, because her English is good. Wife's lack of ability in English prevented her from communicating with the children's school teachers. The children were raised speaking Korean at home. Wife acknowledged that defendant helped her get a driver's license.

Defendant gave Wife the nickname of " '49er.' " It was a play on the Korean word for clumsy. According to defendant, it was a term of endearment, not derogation. Wife used to joke about how clumsy she was, saying she would win contests in two activities, sleeping and breaking things. She broke many appliances. She falls a lot and bruises easily. She fell a couple of times walking the children to school, so she stopped walking them to school.

Over objections, Wife testified that she never got along with Mother, who criticized her about little things from the beginning. After three years, Mother began to physically abuse Wife and demand money. According to defendant, when Mother offered to move out, he and Wife wanted her to stay. Wife acknowledged that she had once given Mother a card signed " '49er' " thanking her for all her help.

Wife testified that defendant was verbally abusive in 2007 and sometimes called her "stone head." She described two physical incidents that preceded the charged offenses. In the spring of 2007, when she wiped yogurt off the younger son's face with her hand, defendant told her to use a napkin and hit her on the back. In 2007 when she was planting flowers, he kicked her buttocks for not looking at him.

---

[3] Sylvia Choi is defendant's mother. Hae Eun Choi is defendant's wife and the mother of his two children. To avoid confusion, we will refer to defendant's mother as Mother and to his wife as Wife.

Defendant denied ever kicking Wife, saying he feels strongly that violence does not resolve anything.  He had no recollection of any intentional physical confrontations between him and Wife.  He had no recollection of a yogurt incident.

### 1.  January 10 Incident

Defendant and Wife both testified that, on the morning of January 10, 2008, he criticized her in the garage of their Saratoga home as he was getting ready to drive the children and his mother to school.

According to defendant, a tool cart was in the wrong place and was blocking his path to his car.  He was aware that Wife had used a hammer from the cart the night before.  He asked Wife why she had not put things away properly.  She first denied using any tools, but then said that she thought she had put the tool back in the right place.  He pulled the hammer out of the drawer and held it out to show her the hammer she had used.

According to defendant, he said, "[D]on't lie to me.  This is the hammer you lied about."  He shook it and held it in front of him at shoulder level with his palm up.  He was disgusted by her lying.  He put the hammer away and took the children to school.

According to Wife, defendant held the hammer in front of him with his arm bent and asked in an angry tone, " '[S]hould I hit you with this[?]' "  She told him to hit her.  She did not think he would.  Wife testified both that he was and was not within arm's length of her.  He put the hammer away and left in his car.

Defendant denied threatening physically or verbally to hit her with the hammer and her encouraging him to do so.

### 2.  January 11 Incident

The following day, January 11, 2008, defendant, Wife, and their two children had lunch at a table in their large kitchen.  According to defendant, an argument arose at lunch because the older son had been inappropriately dressed for a school field trip that

morning and he had brought home the lunch that Wife had prepared because he did not like it.

After lunch, defendant went to a bathroom near the kitchen to brush his teeth. According to Wife, defendant criticized her for not feeding the children enough protein. She responded that she was feeding them fish in a Korean style. He called her an idiot (in Korean, literally "stone head") six times. She got upset and called him a "stone head." Defendant picked up a blue plastic bathroom cup used by the older son and threw it at Wife, who was standing by the kitchen sink. According to Wife, defendant was five to six meters away, about 18 feet, when he threw it. According to Wife, the cup hit her in the face above her lip. She did not know if the cup broke when it hit her or when it hit the floor. Defendant denied throwing a cup at Wife and had no idea how it broke.

Wife testified that defendant walked up to her quickly and engaged in a wordless physical attack. He first punched her with a fist to the forehead, which knocked off her glasses. He followed this by slapping both cheeks several times. He grabbed her shoulders and shook her. He punched her again and she fell to the ground. When she was on the ground, he stepped on both sides of her neck and her back five or six times like he was stepping on a worm. He was not wearing shoes. She tried to get away. She did not try to defend herself or kick at him. Defendant grabbed her by the hair and dragged her to a sliding glass door. He opened the door, pushed her out, and told her to go back to Korea. She did not bump her head on the door frame. When she came back inside and sat on the floor, defendant said, " 'You should have been hit to death at that time by my mother,' " referring to a time when his mother had struck her. The younger son came up to her and tried to get her to smile as she sat on the floor.

Defendant described their encounter differently. As he brushed his teeth, the younger son playfully slapped Wife's hand and kicked her shin. She reacted by saying "ouch" and punched the younger son in the chest. This made defendant very upset, though not angry. He ran to the younger son who was shocked and could not breathe.

He said to Wife, "'[A]re you stupid? He could have cardiac arrest.'" She responded by calling defendant stupid and trying to kick the younger son. After that there was no more verbal communication between them. Defendant, who was kneeling, blocked her kick with his arm. Defendant wanted to protect his younger son. Defendant still was not angry, just upset. He pushed Wife away, but did not recall what part of her body he pushed.

Wife came at them kicking again. Defendant stood up and pushed her away again. He grabbed her under the armpit and pulled her five or six feet away from the younger son. He tried to pull her out the sliding glass door but she resisted so violently that he gave up with her still inside the house. Defendant picked up the younger son and took him to another room. The older son was going into and out of the room while this occurred. During their struggle, defendant did not punch or kick Wife or intentionally push her into anything, but she might have bumped into a counter or a wall. They avoided each other the remainder of that day.

### 3. Testimony by the Older Son

On January 13, 2008, the older son, then five years old, was interviewed in his family's living room in Korean by Deputy Sheriff Ryan Kim, a certified bilingual officer. Kim believed the older son knew why the officers were there. Kim asked if he knew the difference between telling the truth and lying. Kim had specific training in how to interview children, and tried to ask open-ended questions. He asked if the older son had ever seen his father hitting his mother. "Once I started to ask questions about mom and his dad, he had a lot of stories." He seemed calm and sharp for a five-year-old.

The older son told Kim that a couple of days earlier his father slapped Wife and pulled her to the ground by her hair. He kicked her once and punched her a couple of times. The older son acted it out to clarify what he was saying. He said that defendant slapped and punched Wife almost every day and also frequently punched him and his

younger brother. The older son had no marks on him when he pulled up his shirt at the officer's request.

The older son was seven when he testified at trial in June 2010 with his therapist Jonee Donnelly as a support person. He was afraid of talking to the judge because court was a strange place to be. He remembered talking to an officer in English and Korean on a sofa. He told the police officer "[m]y dad hit my mom," but "[t]hat was a lie." He told the police officer that "[b]ecause my mom said to." He did not remember when she told him to say so. He had said that defendant hit Wife every day, but it was not true. His parents did not argue and did not fight about his bathroom cup. He does not know how the cup (which was in evidence) broke.

When asked if anything scary or upsetting had happened at home a couple of days before he talked to the police, he said, "My mom grabbed my shirt and then he [*sic*] put my lips on the ground and then my lips bleeded."

Cross-examination of the older son was limited to establishing that his mother had showed him pictures of her bruises a couple of days before he testified.

### 4. Other Witnesses' Testimony

After the confrontation on January 11, 2008, Wife talked to their neighbor, Preshant Bhatnagar, who testified as follows. Wife knocked on his door, almost crying and looking terrified. She said in limited English that her husband had just beat her up. The neighbor saw red marks on her hand and on the back of her neck.[4] She stayed 30 to

---

[4] On appeal defendant asserts that the neighbor "did not observe any bruising or other marks above her eye, on her neck, or on her leg, elbow or abdomen." We note that the neighbor was not specifically asked whether he saw any injuries in any of these locations. When asked on direct examination if he observed any injuries on Wife, he recalled red marks on her hand and the back of her neck. He denied having told the police that she had bruises all over her body.

45 minutes. He repeatedly offered to call 911. She declined his offer, saying she wanted to reconcile with her husband. He gave her water and she calmed down.

Wife testified that she did not want the police called because she did not want the family broken up.

According to the neighbor, the next day he knocked on the door of Wife's house. When she answered, he asked in a whisper if she was okay. She said she was.

According to Wife, when she and defendant went to bed the night of January 12, 2008, he asked her for a divorce after she confirmed she had an IUD implanted a year earlier without telling him. He told her to leave within seven days, "Otherwise, I will kill you."

According to defendant, his request for a divorce was preceded by Wife asking him for an apology. He instead accused her of concealing from him that she had an IUD implanted when she was in Korea in January 2007. He said that she had been completely dishonest with him and a marriage should be based on trust, so he asked for a divorce. She asked for compensation for ruining her life. She asked for custody of the older son and a return of her dowry. Defendant denied threatening to kill her unless she moved out.

The next day, January 13, 2008, while the rest of the family visited friends out of town, Wife went to the neighbor's house and asked him to call the police. The neighbor recalled that there were still visible red marks. Wife called the police because she had no money and nowhere to go. Wife later said at a deposition that the situation would have ended if defendant had apologized to her.

Sergeant Cannan came to the neighbor's house that day and interviewed Wife for over an hour with the assistance of an interpreter for the sheriff's department on the telephone. Wife was visibly upset as she described what had happened. Cannan saw a bruise over Wife's left eye. She showed him other bruises on the right elbow, right leg, and the right side of her abdomen. She said her neck was sore and painful. She had a Salonpas patch on her neck. When she removed it, Cannan did not see a bruise there.

Wife told Cannan that defendant had hit her in the face with a plastic cup that he threw from nine meters (about 27 feet) away. She showed him the broken cup. Defendant rushed up to her and punched her above the left eye. He hit her several more times as she fell to the ground. He kicked her at least once and punched her head and shoulder five more times. He grabbed her by the neck and shoulder and dragged her into another room. Defendant tried to shove Wife out the sliding glass door, but she grabbed the frame until defendant gave up.

Sergeant Cannan went with Wife to her house. Her hand shook considerably when she opened the door. Cannan took several photos of the scene and of Wife's injuries. He collected the hammer as evidence. He was one of the deputies who arrested defendant later that day. He saw no injuries to defendant.

At trial, Wife identified several of her bruises in the photographs taken by Sergeant Cannan.[5] They depicted a bruise on the left of Wife's forehead (Exhibit 13), a blue and purple bruise on her right elbow (Exhibits 15, 17), a fainter discoloration on her right forearm (Exhibit 16), a purple bruise on her thigh (Exhibit 18), and red marks and possibly a darker discoloration on her right side (Exhibit 20). She did not see a doctor about the bruises.

Dr. Richard Kline, a trauma surgeon, testified for the defense that, while bruises tend to change color with age, he could not identify from the photos how old any bruise was or what caused it. He did not see a bruise on a photo of the neck, but did see bruises on the head and elbow. A number of factors are involved in how much an individual may bruise. He would expect a kick by a 180 pound man to bruise a person's neck.

By the time of trial in June 2010, Wife and defendant were involved in divorce proceedings. Defendant had joint custody of the children. Wife admitted that, in her

---

[5] This court has reviewed the photographs.

haste to move out of the house, she took jewelry of defendant and his mother. Wife and defendant disagreed in their testimony about whether some items of jewelry were gifts. Wife admitted saying at a divorce deposition that she would return his jewelry when defendant returned her dowry. Defendant testified that refund of a dowry when a marriage fails is not traditional.

### 5. Nontestifying Witnesses

#### a. The Older Son's Therapist

There was considerable discussion at trial about defendant's proposal to call Jonee Donnelly as a witness. She was identified in defendant's trial brief as an expert who would testify that the older son "lies repeatedly and is under [the] influence of [his] mother." Defense counsel described Donnelly as a licensed family and marriage counselor who was appointed to evaluate the children for the Santa Clara County Superior Court.[6]

Defense counsel made the following offer of proof as to Donnelly's testimony: The older son was seven years old in 2010 and had been in therapy for a number of years. He has a rich fantasy life and struggles with telling the truth. He has stated defendant beats him and his younger brother every day. He is strongly under his mother's influence. "[H]is testimony will reflect what his mother has told him to say and that he has a certain fear of not following his mother's directions on this." Wife had showed the older son photos of her bruises just two days before trial. The prosecutor responded that

---

[6] On appeal defendant characterizes Donnelly as a court-appointed counselor for the children. Her actual status is not clear. Donnelly described herself under oath as the appointed therapist for the older son. However, when asked under what authority she was appointed, she clarified that the parties in the dissolution had stipulated to her serving as therapist.

she did not intend to introduce any testimony by the older son except for the charged offenses.

The court conducted an in camera section 402 hearing with Donnelly in the absence of counsel. After the hearing, the court ruled: "I think there is an issue as to veracity that Ms. Donnelly could provide information on. I do not believe she can testify as an expert witness on the issue of whether he has lied on any given occasion or whether his testimony in court will be a lie. But I think she can provide information that is something that needs to be addressed in terms of Mr. Choi's Sixth Amendment right of confrontation if [the older son] is going to be called as a witness. [¶] So I would allow her testimony and find that the privilege, assuming that it has not been waived by [the older son], is his [*sic*] to be breached because the Sixth Amendment confrontation rights of Mr. Choi require that in this situation." The court also allowed Donnelly to serve as the support person for the older son during his testimony.

Several days after this ruling, defense counsel informed the prosecutor that he would not be calling Donnelly as a witness, but then indicated he changed his mind. The prosecutor objected based on lack of discovery and relevance. Defense counsel offered the prosecutor an opportunity to spend some time with her. "The testimony is about, as I mentioned, both [the older son's] reliability and the fact that I believe that he suffers from certain character personality defects which affect his ability to recall, his ability to say things which he did on the stand."

The court ruled: "[T]he real reason why I am excluding the testimony now is I do not believe that the area in which you wish to question her is properly an area for expert testimony. And based upon that and the fact that there was, to some lesser degree, an issue of allowing [the prosecutor] the opportunity to properly prepare for her cross of her, I am gonna deny the request to have her called as a witness. [¶] The basic reason is I do not believe her testimony is properly the subject of expert testimony. And that is the

credibility of witnesses. And specifically, the law requires-says that expert testimony on that particular point is not allowed."

### b. Defendant's Mother

Unlike Donnelly, there was little discussion in the trial court about calling Mother as a witness. She was not among the four potential witnesses identified in defendant's trial brief, although apparently defense counsel identified her as a potential witness off the record in chambers. When defense counsel proposed Mother as a support person for the older son, the prosecutor objected because defense counsel had just named her as a witness. In response, defense counsel offered to not call her as a witness. At the conclusion of in limine motions, defense counsel stated that Mother was a percipient witness from whom he had no statement other than what appeared in police reports.[7] He did not intend to call her except possibly in rebuttal. Ultimately, Mother was not called as a witness as trial.

## B. JURY INSTRUCTIONS

Pertinent to this appeal, the jury was given CALCRIM No. 226 that "[y]ou may believe all, part, or none of any witness's testimony." The instruction describes a number of factors are relevant to credibility, including: "What was the witness's behavior while testifying?" "Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case or a personal interest

---

[7] At that hearing defense counsel asserted that "I have no statement from her" apart what was in the police report. The prosecutor acknowledged having that report. The reporter's transcript reflects that defense counsel next said, "She made two statements to me." The court clarified, "No statements have been made other than to you or to any investigator of yours other than what is stated in the police report?" Defense counsel answered, "No." It is clear from the context that the word "no" was incorrectly transcribed as "two," as defendant contends, and that the Attorney General is incorrect in claiming that defense counsel had statements from her.

in how the case is decided?"  "What was the witness's attitude about the case or about testifying?"  "Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?"  "Did the witness admit to being untruthful?" (Evid. Code, § 780.)  The jury was also instructed how to evaluate the testimony of a child younger than 11 years old.  (CALCRIM No. 330.)

Based on defendant's testimony that he had attempted to defend his younger son, the jury was also instructed about self-defense and defense of another with CALCRIM Nos. 3470, 3471, 3472, and 3474.  They were instructed that it is lawful to defend another if:  "One.  The defendant reasonably believed that he or someone else was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully;  [¶]  Two.  The defendant reasonably believed that the immediate use of force was necessary to defend against that danger;  [¶]  AND  [¶]  Three.  the defendant used no more force than was reasonably necessary to defend against that danger."  (CALCRIM No. 3470; cf. Pen. Code, § 693, subd. 1 ["Resistance sufficient to prevent the offense" may be made to prevent an offense against one's family]; Pen. Code, § 694 ["resistance sufficient to prevent the offense" may be made in "defense of the person about to be injured"].)

As defendant points out, the court omitted the following optional instructions from CALCRIM No. 3470.  "If you find that [the victim] threatened or harmed the defendant [or others] in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.  [¶]  If you find that the defendant knew that [the victim] had threatened or harmed others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.  [¶] Someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person."

## C. CLOSING ARGUMENTS

The prosecutor argued that defendant's own testimony illustrated "[i]t was his need to be having everything precisely the way he wanted it that caused him to lash out violently towards his wife." "[W]hat this case really has turned into is whether or not to believe the victim, Hau Eun's testimony, or whether or not to believe the defendant's testimony. Because under the defendant's testimony, self-defense comes into play. And under the victim's, it does not." It was natural for Wife to describe the incident differently on different occasions. Her prior statements were mostly consistent. It did not really matter exactly from where defendant threw the cup.

Wife's testimony was corroborated by her neighbor and her older son. "Mr. Bhatnagar is the most important witness in this case because there's no reason to tell anything, doubt anything that he said and he corroborates what happened with Mrs. Choi." What the older son told and acted out to Deputy Kim also corroborated Wife's testimony. Wife's description of defendant kicking and hitting her in 2007 "shows that this is something that was probably going on all the time, just the way [the older son] says it was." As to the older son's testimony that his mother told him what to say to the police, she had no opportunity to coach him. According to defendant, he spent the next two days with the children and the third day he took them out of town. Also, if she coached him, his story would be the same as hers, but it was not. It would be hard to teach a five-year-old an elaborate story. The older son "told the deputy the truth. And the poor kid on the stand, he was torn." The day before the older son testified, he spent the weekend with defendant. The older son ran up to defendant and jumped into his arms before testifying. That seemed a little contrived. He was torn, but he decided to help his father and say he lied. If it was the truth that he lied, he would be able to say when his mother told him to lie.

The prosecutor asserted, "[I]f you believe the defendant, then he's - he's, in fact, not guilty of Count 1. If you believe that he was truly acting to protect [the younger son],

and he gets to do that, the law says that's okay. But that's not what happened." Defendant's testimony was not credible "because he doesn't have any details to provide." He could not say how Wife reacted violently or how she kicked him. Defendant had no explanation for the bruise on her face. To the extent that defendant's description of incident differed from Wife's, it illustrated his need for power and control. His mother could make lunches right, not his wife. His description of their struggle in the kitchen was not credible. One would not grab an armpit to pull a person. Wife's version made sense, not his.

### 1. Defense Argument

Defense counsel argued to the jury that there was a reasonable doubt about what happened. Wife's testimony about defendant throwing a cup 27 feet around a corner was not credible. Defendant's testimony about their confrontation was more credible because he explained where the children were. Defendant said that he ran over to protect the younger son.[8] Wife's heating patches may have aggravated her skin and left some of the marks shown in the photos. Wife contradicted herself about whether she was pushed out the door. If she had been kicked twice in the neck and slapped five or six times in the face, there would have been bruises, but there was none. Wife did not tell Sergeant Cannan that she was dragged by her hair. The sergeant saw no bruise on her neck under the Salonpas.

The older son could have been coached after defendant was arrested. What training did Deputy Kim have to interview a child?

That defendant was given joint custody of the children by the family court was evidence that he was no monster. Wife was the violent one. The older son said so. He

---

[8] Although the jury was instructed about defense of others, defendant points out on appeal that, apart from mentioning that defendant was seeking to protect his son, "defense counsel barely mentioned that defense in his closing."

said "his mother grabbed him by the shirt, put his face to the ground and made his lip bleed and told him not to lie before he came in here. Who's lying? Who's the violent person in this? You ever grab a young child? You saw the size of that kid, grab him and slam his face in the ground and say don't lie. And Mr. Choi is supposed to be a violent man and the mother is not. That make sense to you? Doesn't make any sense to me, I can tell you that. I was so shocked by that that I had to come back and get a reading later on to make sure that I heard what I heard. Because I don't hear about mothers slamming kids faces into the ground very often."[9]

Wife complained about Mother, yet she gave her a card thanking her for her help. Wife was also lying about being given the jewelry. There was no corroboration by the children or defendant's mother about the hammer incident.

## 2. Prosecution Rebuttal

The prosecutor responded by arguing that Wife did not have to explain why the younger son was not injured during the struggle because he was not between his parents. There were grains of truth in Wife's testimony. People sometimes do not bruise when they expect to. Whether Wife was dragged by her hair or her neck and shoulders does not matter. There was no testimony that the older son saw his father arrested, giving Wife a chance to coach him. The officers would not have let the witnesses speak together before interviewing them. Who really owns the jewelry is a typical divorce

---

[9] There was no testimony by the older son or anyone else that his mother slammed his face into the ground a few days before the trial and told him not to lie. He did testify that she put his face on the ground a few days before his police interview. In reply to this argument, the prosecutor pointed out that there was no evidence of a bloody lip when the older son testified and questioned whether this referred to a sequence of events immediately preceding trial. Our review of the jury argument shows that there is no support for the assertion in defendant's opening brief that "the prosecution negligently or intentionally argued in closing that this incident took place immediately before trial."

dispute and was not relevant to this case. What older son said in court did not mean much because he did not want to be in court.

Regarding the hammer incident, "[d]efendant certainly could have called his mom in to talk about how it never happened and he didn't do that."

## D. NEW TRIAL MOTION

After trial, new counsel for defendant asserted the following grounds for a new trial: The trial court should not have excluded testimony by a handwriting expert establishing both that Wife had vandalized the family home by writing graffiti on the walls after defendant was arrested and that Wife later lied about who did it in a deposition in the divorce proceedings. Trial counsel was constitutionally ineffective in failing to call two witnesses, defendant's mother and therapist Jonee Donnelly,[10] and in failing to object to a prosecutorial reference to defendant's right to remain silent. Finally, the evidence did not support the conviction. Offered in support of the new trial motion were declarations by trial counsel James Leininger and defendant's mother Sylvia Choi, a letter from handwriting expert Patricia Fisher, and excerpts from Wife's deposition and Donnelly's notes. The prosecution opposed the motion in writing and the trial court denied it after a hearing.

## II. ANALYSIS

On appeal defendant renews three contentions made in his motion for new trial, specifically that the trial court erred in excluding the handwriting expert and that trial counsel was ineffective in failing to properly call as witnesses defendant's mother Sylvia Choi and the older son's therapist Jonee Donnelly. He also separately claims that the trial court erred in denying his motion for new trial, asserting that the jury should have heard

---

[10] Trial counsel did offer Donnelly as a witness. On appeal, defendant has refined his claim, arguing that trial counsel failed to properly present Donnelly's testimony by accurately describing its relevance.

evidence "establishing that [Wife] had a long history of physically abusing her young children before and after the incident alleged; had vandalized [defendant's] home and lied about it under oath; and had previously lied about the incident for which [defendant] was on trial." The jury would have heard this additional evidence, according to defendant, if the court had not excluded the handwriting expert and if trial counsel had been competent.

## A. EXCLUSION OF HANDWRITING EXPERT

On appeal defendant renews and expands the contention in his new trial motion that the trial court erred in excluding under Evidence Code section 352[11] testimony by a handwriting expert that would have impeached Wife's credibility. We review the trial court's ruling for an abuse of discretion.

Defendant moved in limine to call handwriting expert Patricia Fisher to testify about graffiti found in the family home some time after defendant was arrested in January 2008. Variations on the older son's name were found written on walls and a door. In a deposition in the divorce proceedings attended by defense attorney Leininger on September 9, 2008, Wife denied that it was her handwriting on the wall and stated that she recognized it as the older son's. Handwriting expert Fisher was prepared to testify that it was Wife's handwriting based on comparing handwriting samples from the older son, defendant, Mother, and Wife to photographs of the graffiti. The prosecutor objected to this evidence on relevance grounds and asked for its exclusion under section 352.

The court tentatively ruled as to the evidence that Wife apparently lied on one occasion in a deposition, "I don't feel that that fact is sufficiently probative and I feel it is outweighed by the undue consumption of time that it will take to establish the possible lie

---

[11] Unspecified section references are to the Evidence Code.

through handwriting analysis." The court also noted that the exemplars and Fisher's qualifications were only recently produced to the prosecution.

After additional argument, the court confirmed its ruling that "the probative value of this evidence, potential evidence, is not [*sic*] outweighed by the prejudicial nature backed under 352 and the undue consumption of time that would be involved in having a mini trial on the handwriting analysis which would involve the witness, Ms. Fisher, and potentially a prosecution witness as indicated by [the prosecutor]."

Defendant contends that the excluded testimony by the handwriting expert was "highly relevant to the largely unimpeached testimony of [Wife], as it would have established both [Wife's] criminal disposition and her willingness to lie under oath." In the trial court, defendant asserted that Wife was subject to impeachment by evidence that she had committed perjury (Pen. Code, § 118) by saying at a civil deposition on September 9, 2008, that she did not write her older son's name on the walls of their family home. On appeal, defendant also contends that a person may be impeached for misdemeanor conduct involving moral turpitude (*People v. Wheeler* (1992) 4 Cal.4th 284, 295-297), such as the crime of vandalism (Pen. Code, § 594) that Wife committed by writing on the walls of a home owned by defendant some time after their physical confrontation. (*People v. Campbell* (1994) 23 Cal.App.4th 1488, 1493.) Defendant does not claim that Wife has been convicted of either perjury or vandalism, but he asks to introduce evidence that she had committed both offenses.

Of course, evidence that a witness has lied under oath on another occasion is relevant to that witness's credibility. (Cf. *People v. Ayala* (2000) 23 Cal.4th 225, 271; cf. *Wheeler*, *supra*, 4 Cal.4th 284; *In re Freeman* (2006) 38 Cal.4th 630, 640, fn. 5.) "The existence or nonexistence of *any* fact testified to by . . . " a witness is relevant to the witness's credibility. (§ 780, subd. (i); our emphasis.) "Evidence Code section 780, however, does not 'say that all evidence of a collateral nature offered to attack the credibility of a witness would be admissible. Under Section 352, the court has substantial

discretion to exclude collateral evidence. The effect of Section 780, therefore, is to change the present somewhat inflexible rule of exclusion to a rule of discretion to be exercised by the trial judge.' (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1995 ed.) foll. § 780, p. 587.)" (*People v. Thornton* (2007) 41 Cal.4th 391, 428.)

The United States Supreme Court has recognized that "the right to introduce relevant evidence can be curtailed if there is a good reason for doing that. 'While the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.' [Citations.]" (*Clark v. Arizona* (2006) 548 U.S. 735, 770.)

*People v. Cunningham* (2001) 25 Cal.4th 926, 998, notes that "Although the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right. [Citation.] Accordingly such a ruling, if erroneous, is 'an error of law merely,' which is governed by the standard of review announced in *People v. Watson* (1956) 46 Cal.2d 818, 836" [reasonable probability of a more favorable result absent error].

Significantly, the impeachment offered by defendant was not that Wife had lied about the facts underlying the charges. Instead, defendant sought to prove that sometime after their physical confrontation on January 11, 2008, and during their separation, Wife had vandalized defendant's house and then, on September 9, 2008, lied about doing so at a civil deposition. This fits the definition of a collateral matter.

"A collateral matter has been defined as 'one that has no relevancy to prove or disprove any issue in the action.' (1 Jefferson, Cal. Evidence Benchbook (3d ed. 1997) §§ 27.105, 27.106, pp. 478-479.) A matter collateral to an issue in the action may

nevertheless be relevant to the credibility of a witness who presents evidence on an issue; always relevant for impeachment purposes are the witness's capacity to observe and the existence or nonexistence of any fact testified to by the witness. (Evid. Code, § 780, subds. (c), (i); [citation].) As with all relevant evidence, however, the trial court retains discretion to admit or exclude evidence offered for impeachment. (Evid. Code, § 352; [citation].) A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

Defendant offered a handwriting expert who had analyzed graffiti on the walls of defendant's house and handwriting samples of possible writers. It is easy to believe that the prosecution, in order to cross-examine this expert, would have to consult with, if not call, its own handwriting expert. There would also need to be testimony from Wife and the older son and possibly other witnesses about the authorship of the handwriting on the wall and the circumstances of its discovery. The most defendant could have established through this evidence is that, after their physical confrontation, Wife had vandalized defendant's house and later lied about doing so.

We conclude that the trial court did not abuse its discretion in excluding under section 352 this offered impeachment on a collateral topic. (Cf. *People v. Bittaker* (1989) 48 Cal.3d 1046, 1097 [whether witness had falsely accused other individuals of molestation would consume considerable time].) Far from Wife being "largely unimpeached," as defendant contends, there was ample evidence of inconsistencies in her versions of what happened on January 11, 2008, and some of her trial testimony about the severity of the beating was contradicted by the photos of her injuries and the recollections of Sergeant Cannan and her neighbor. Defendant was not precluded from highlighting

those inconsistencies.  We find no abuse of discretion in the trial court's conclusion that the offered impeachment on a collateral issue did not have significant probative value.

Even if we were to conclude that the trial court had abused its discretion in excluding this evidence, "we cannot say it is reasonably probable that a result more favorable to defendant would have been reached in the absence of the error." (*People v. Wright* (1985) 39 Cal.3d 576, 586.)  The jury was aware of inconsistencies in Wife's descriptions of the charged offenses and, indeed, acquitted defendant of the brandishing charge.  We believe that evidence of dishonesty by Wife in a different context "would have introduced a variety of collateral credibility issues, and would not 'have produced "a significantly different impression of [the witness's] credibility."'" (*People v. Harris* (2008) 43 Cal.4th 1269, 1292.)

## B. COUNSEL'S INEFFECTIVENESS IN FAILING TO PRESENT WITNESSES JONEE DONNELLY AND SYLVIA CHOI

In a motion for new trial based on trial counsel's ineffectiveness, "defendant may prove such ineffectiveness if he establishes that his counsel failed to perform with reasonable competence and that it is reasonably probable a determination more favorable to the defendant would have resulted in the absence of counsel's failings." (*People v. Fosselman* (1983) 33 Cal.3d 572, 584.)

In reviewing the evidence offered by a motion for new trial, " ' "the trial court may consider the credibility as well as materiality of the evidence in its determination [of] whether introduction of the evidence in a new trial would render a different result reasonably probable." [Citation.]' " (*People v. Howard* (2010) 51 Cal.4th 15, 43, quoting *People v. Delgado* (1993) 5 Cal.4th 312, 329; cf. *People v. Sing Yow* (1904) 145 Cal. 1, 5-6.)  A court need not grant a new trial when the offered evidence is unworthy of belief and unlikely to change the result on retrial. (*Delgado*, *supra*, 5 Cal.4th at p. 329.)  Trial courts are entitled to be skeptical of trial counsel's post-trial declarations of self-confessed inadequacy. (*People v. Saidi-Tabatabai* (1970) 7 Cal.App.3d 981, 988-989; cf.

*People v. Beagle* (1972) 6 Cal.3d 441, 457; *In re Burton* (2006) 40 Cal.4th 205, 223.) "It is undeniable that trial judges are particularly well suited to observe courtroom performance and to rule on the adequacy of counsel in criminal cases tried before them." (*Fosselman*, *supra*, 33 Cal.3d at p. 582.)

### 1. Standard of Review

Defendant asserts in his opening brief: "While it is well-established that a trial court enjoys 'broad discretion' in ruling on a motion for new trial, 'where the complaining party reasserts, on appeal, the claims previously raised in an unsuccessful new trial motion, the appellate court must employ independent review and judgment to determine if prejudicial trial error occurred.' *(People v Ault* (2004) 33 Cal.4th 1250, 1261; *People v. Lavergne* (1971) 4 Cal.3d 735, 745.) Therefore, pursuant to article VI, § 13 of the California Constitution, this Court is obliged to 'conduct an independent examination of the proceedings to determine whether a miscarriage of justice occurred.' (*Ault, supra*, at pp.1261-62.)"

Defendant has misidentified the applicable standard of review. Although the language quoted by defendant does appear in *Ault*, defendant overlooks the issue involved in that appeal. The Supreme Court "granted review in this case to determine the proper standard of review when the trial court *granted* a criminal defendant's motion for a new trial on grounds of prejudicial juror misconduct, and the *People* appeal, disputing only the trial court's determination that the misconduct *was prejudicial*." (*Ault, supra,* at p. 1255.) The footnote following defendant's initial quotation from *Ault* exclusively cites juror misconduct cases. (*Id.* at p. 1261, fn. 4.) The entire context of that decision was whether to apply a special standard of review in new trial motions based on juror misconduct. The court concluded that the special standard does not apply when a court grants a motion on that basis. "We therefore confirm that when a trial court, after examining all the relevant circumstances, grants a new trial in a criminal case on grounds that proven misconduct was prejudicial, that determination is not subject to independent

or de novo review on appeal, but may be affirmed unless it constituted an abuse of discretion." (*Id.* at p. 1255.)

The independent review standard cited by defendant applies only to trial court findings that a defendant was not prejudiced by juror misconduct. The general standard of review of a ruling on a motion for new trial not involving juror misconduct, as the Attorney General shows, is abuse of discretion. (*People v. Williams* (1988) 45 Cal.3d 1268, 1318; *Delgado*, *supra*, 5 Cal.4th at p. 328.) This standard applies when the motion is based on a claim that trial counsel was ineffective. (*People v. Andrade* (2000) 79 Cal.App.4th 651, 661; *People v. Callahan* (2004) 124 Cal.App.4th 198, 209.) "In determining whether counsel's performance was deficient, [an appellate court] must accept all factual and credibility findings that are supported by substantial evidence. [Citation.] Although the trial court's determination of deficient performance is a mixed question of fact and law [citation], we defer to that determination where, as here, it is 'predominantly factual or credibility based. [Citations.]' (*Ault, supra,* at p. 1265, fn. 8.)" (*Callahan*, *supra*, 124 Cal.App.4th at p. 211.)

## 2. Denial of the Motion for New Trial

Both Donnelly and Mother would have offered evidence of Wife's violent character, among other topics. The new trial motion did not assert that the trial court had erroneously excluded evidence of Wife's violent character. Indeed, the motion assumed that the trial court had ruled admissible the older son's "fear of his mother and her continuing physical abuse of him," and this assumption, although erroneous, is repeated on appeal.

The new trial motion was supported by a declaration by Mother that she had lived with defendant's family at all relevant times and had witnessed child abuse by Wife, including her striking the older son with a stick intended for disciplining children, pushing him down onto a concrete slab, and banging his head on the floor and bloodying

his lip after he misbehaved in school. Wife often slapped the younger son on the face and body when he was as young as two years old.

Mother was not present during defendant's physical struggle with Wife on January 11, 2008. When Mother returned home that day, Wife told her that she had fought with defendant, but not that defendant had punched or slapped her. Mother saw no injuries on Wife. The older son told Mother that the fight began when "'Mommy kicked Daddy.'" On January 12, 2008, defendant told Mother that the confrontation began when Wife punched the younger son in the chest. Some time after March 2, 2008, the older son told her that both he and his mother had written some of the graffiti on the walls. Trial counsel James Leininger had never interviewed her.

There was no declaration by Donnelly in support of the motion for new trial, but new defense counsel offered a summary of Donnelly's notes of therapeutic conversations with the older son when he was six and seven years old. The earliest summarized note was from May 19, 2009. After a session on June 12, 2009, Donnelly reported Wife to Child Protective Services because the older son said that she had pulled his arm, hit him, and sat on him. At later times, the older son told Donnelly that he was afraid of his mother because she yells at him and hits him. On February 9, 2010, the older son said that he wanted to live with his father and "'Dad didn't hit mom.'" He also said on November 18, 2009, and June 11, 2010, that dad did not do what mom said he did.

Trial counsel Leininger filed a declaration apparently intended to establish his own incompetence. As to Mother, Leininger declared that he never spoke with her and was unaware that she would have testified that she saw no injuries on Wife and that older son told her that Wife had kicked defendant. "I do not recall why I did not call [Mother] during the defense case-in-chief to testify as to specific incidents where [Wife] was violent toward the children. I now realize that testimony would have bolstered [defendant's] trial testimony that the incident on January 11, 2008 resulted from his attempts to protect [the younger son] from a violent assault by [Wife], and that this

version of events, if believed, would have provided [defendant] with a complete defense. I did not make a strategic decision not to call [Mother] as a defense witness at trial."

As to Donnelly, Leininger declared that he received voluminous notes of Donnelly's therapy sessions with the older son. "I do not recall reviewing those notes in depth, nor do I recall considering whether to call Donnelly to the stand to testify as to [the older son's] fear of his mother, or to establish that [the older son] frequently reported to Ms. Donnelly physical abuse he and [the younger son] suffered at the hands of their mother . . . . I did not make a strategic decision not to call Ms. Donnelly during the defense case to establish these facts."

The People opposed the motion in writing, arguing in part that Donnelly's testimony would have postdated the charges and that defense counsel made a tactical decision not to call defendant's mother. "Assuming [Mother] would testify consistently with her declaration, the People had ample ammunition, in the form of prior inconsistent statements[,] with which to impeach her. In addition [Mother's] obvious bias, that her son is the Defendant[,] would have been prominently spotlighted. Perhaps most importantly lending to Mr. Leininger's decision was [Wife's] own testimony regarding [Mother's] violence toward her."

At the hearing on the motion for new trial, new counsel argued that it would have been a very different case if Mother or Donnelly had testified that Wife was consistently violent toward the children. In denying the new trial motion, the trial court ruled: "I think in this case that the jury heard the evidence that they needed to hear and that they made a decision based upon that. And certainly if they had believed Dr. Choi and believed [the older son] - he made it up because the mother told him to - they could have found differently." We find no abuse of discretion in the trial court's reasoning. If we assume that trial counsel had offered the testimony of defendant's mother and the older son's therapist on the grounds now asserted on appeal, it is not reasonably probable that an outcome more favorable to the defendant would have resulted.

**C.** **NEW EVIDENCE REGARDING WIFE'S VIOLENT CHARACTER**

We now proceed to evaluate defendant's new theories of relevance not offered by trial counsel. On appeal, defendant contends that "evidence of [Wife's] prior physical abuse of her children was relevant and admissible for at least two . . . purposes: (1) to impeach the testimony of [Wife] [citation]; and (2) to serve as substantive evidence bolstering the testimony of [defendant], who testified that the physical confrontation on January 11, 2008, resulted from his attempts to protect [the younger son] from a physical attack by" Wife. Citing section 1103, defendant asserts that "[t]he violent character of an alleged victim is not relevant solely to the state of mind of the defendant, but rather constitutes substantive evidence that the alleged victim was in fact the aggressor." According to defendant, this evidence was admissible in support of his "claim that he acted in defense of his child."

### 1. Testimony Presented at Trial

One of the prosecutor's motions in limine was to exclude evidence that Wife used corporal punishment on the children. Defense counsel partly opposed the request, saying that he did not want to be precluded from presenting evidence as to what happened on the day of the altercation. The court ruled, "Given the offer of proof that has been made as to its relevance, I would allow questions regarding corporal punishment to the extent that they relate to the creation of or causing of a dispute between Mr. [a]nd Mrs. Choi [¶] . . . [¶] [o]n the dates in question."

On appeal, defendant characterizes this ruling as "barring [defendant] from presenting evidence of [Wife's] abuse of the children prior to the date of the incident." Defendant dramatizes the impact of the ruling. It was not a categorical ban on such evidence. Instead, the court conditioned the admission of additional evidence on a preliminary showing of relevance outside the jury's hearing. The court did not foreclose presenting other theories of relevance.

The scope of this ruling was untested, as defense counsel did not attempt to introduce evidence of Wife's violent character other than her conduct on January 11, 2008. In fact, defendant testified that he could recall no other physical confrontations between him and Wife. He did testify that on January 11, he rushed up to Wife and pushed her away and later dragged her away in order to protect their younger son against Wife hitting or kicking him again. Wife, according to defendant, had punched the younger son after the son had playfully kicked her and slapped her hand. Defendant testified that he asked Wife for a divorce due to her dishonesty, not because she was violent or abusive to the children.

## 2. New Evidence to Impeach Wife's Testimony

Defendant identifies new evidence of Wife's violent character in the form of personal observations by Mother and statements by the older son to Donnelly and Mother about Wife striking him and yelling at him.

The Attorney General legitimately questions how the older son's statements to Donnelly could survive a hearsay objection. Even if Donnelly's notes of their therapy sessions qualified as admissible business records under section 1271, defendant concedes that what the older son told Donnelly remained hearsay unless subject to another exception. (Cf. *People v. Ayers* (2005) 125 Cal.App.4th 988, 994 [victim's telephone call to victims' hotline was hearsay].) Defendant suggests that special hearsay exceptions for child abuse prosecutions may apply, even though Wife was not being prosecuted for child abuse. (§§ 1253, 1360.)

Setting aside the question of the admissibility of Donnelly's written notes, if called as a witness, Mother could have described any violence she observed Wife inflicting on the children. Defense counsel could have also sought to impeach Wife by asking the older son directly about whether his mother was abusive and whether he was fearful of her learning about his testimony. Although defendant argues that the trial outcome would have been different had the jury learned the older son repeatedly told Donnelly that he

was afraid of his mother, the jury did hear the older son testify that he lied to the police at his mother's behest.

Defendant seeks to use evidence of child abuse involving moral turpitude to impeach Wife, asserting that it is virtually inconceivable that a juror would have regarded Wife's conduct as "reasonable corporal punishment" and that "discipline need not be shown to rise to the level of child abuse" to establish Wife's violent character.

A parent has a right to reasonably discipline his or her child and may administer reasonable punishment without being criminally liable. (*People v Whitehurst* (1992) 9 Cal.App.4th 1045, 1050; *People v Clark* (2011) 201 Cal.App.4th 235, 250-251.) The law distinguishes between justified corporal punishment and criminal child abuse. Evidence of justified corporal punishment is not a crime and is irrelevant to a parent's moral turpitude. Evidence of Wife striking either son on any occasion would not impeach her by demonstrating moral turpitude unless it exceeded her right to discipline her children. That determination could not be made without establishing what, if anything, preceded the physical contact, both in terms of the child's behavior and Wife's prior admonitions or disciplinary efforts, and exactly how much force was used on that occasion. The trial court might need to conduct a section 402 hearing to determine whether any previous physical discipline was potentially probative. Once an incident was admitted, the jury would need to hear details from the child, Wife, and any other witness, such as Mother. The jury would have to be instructed on the elements of Penal Code section 273d ("Any person who willfully inflicts upon a child any cruel or inhuman corporal punishment or injury resulting in a traumatic condition is guilty of a felony . . .") and the parental discipline defense.

Had defense counsel proposed to conduct this type of mini-trial regarding child abuse, the trial court would have considered whether the probative value of the evidence would be substantially outweighed by the likely consumption of time in exploring each incident and potential confusion of the issues.

If we assume that a competent attorney would have sought to impeach Wife by evidence of excessive corporal punishment amounting to child abuse, the evidence would have amounted at best to indirect impeachment, and defendant had more direct impeachment available in Wife's inconsistent statements about the charged offense. It is highly likely that the trial court would have refused under section 352 to conduct a mini-trial of Wife even if defense counsel had argued its relevance to Wife's credibility. We therefore conclude that it is not reasonably probable that defendant would have obtained a better outcome had counsel made this relevance argument, as it is not reasonably probable that the evidence would have been admitted.

### 3. New Evidence to Corroborate Defendant's Testimony

Defendant relies on section 1103 as another theory under which evidence of Wife's violent character could be admitted. It would corroborate his testimony that he acted to protect their younger son against Wife's punching and kicking.

Section 1103 provides in part: "(a) In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character." Section 1103 allows introduction of specific acts of the victim (*People v. Smith* (1967) 249 Cal.App.2d 395, 405) and subsequent acts by the victim (*People v. Shoemaker* (1982) 135 Cal.App.3d 442, 448.)

We reject the Attorney General's argument that testimony that Wife had frequently struck the younger son was "irrelevant to show that [defendant] was justified in acting more quickly or taking greater measures against [Wife] in defense of" the younger son. A victim's violent or aggressive character may be relevant in several ways. First, it may prove that the victim acted in conformity with that character in a confrontation with the defendant, whether or not the defendant was previously aware of

this character.  (*People v. Rowland* (1968) 262 Cal.App.2d 790, 797; see *Shoemaker*, *supra*, 135 Cal.App.3d at pp. 446-447.)  Second, a defendant's awareness of a victim's violent tendencies is probative of the reasonableness of the defendant's fear of the victim.  (*People v. Davis* (1965) 63 Cal.2d 648, 656-657.)  Third, a defendant's knowledge of a victim's violent character is relevant to the reasonableness of the defendant's reaction.[12]  (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1094.)  Of course, if a defendant is unaware of a victim's violent tendencies, then such evidence is irrelevant to the reasonableness of the defendant's fear or reaction.  (*People v. Tafoya* (2007) 42 Cal.4th 147, 165-166.)

Defendant argues that evidence of Wife's violent nature would have corroborated his account of the source of their confrontation.  "[H]e testified during the defense case that the physical confrontation with [Wife], and any injuries sustained by her, were a result of his trying to protect his young[er] son [] from further physical attack by [Wife], which followed [Wife's] punching the child in the chest hard enough to knock the wind out of him.  If believed by the jury, this testimony certainly would have established the complete defense of defense of others and resulted in [defendant's] acquittal.  [¶]  There was no issue at trial as to whether a physical confrontation erupted in the Choi household on January 11, 2008; the only differences between the accounts of [defendant] and [Wife] regarded what had caused that confrontation."  He claims that "the entire defense rested

---

[12]  On appeal, defendant contends that because trial counsel did not argue these theories of relevance, it resulted in the prejudicial error of the court omitting optional portions of CALCRIM No. 3470 to the effect that knowing a victim's propensity for violence may justify quicker and harsher reactions.  As defendant does not separately assert instructional error as a ground for appeal, we will not separately analyze this contention.  Defendant does not explain what evidence at trial would have supported the omitted parts of the instruction and his chief complaint is that trial counsel failed to gain admission of such evidence.

upon the proposition that [Wife] was a person who would punch her 2 ½-year-old son in the chest hard enough to knock the wind out of him."

This argument, however, is factually incorrect. First, the entire defense at trial was not based on Wife's violence toward the children, but rather on her dishonesty. Defense counsel argued that the jury should disbelieve Wife's exaggerated and inconsistent claims and should believe defendant. The prosecutor, naturally, argued that the jury should believe Wife and not defendant. The jury was instructed that it could believe all, part, or none of any witness's testimony.

Second, it is incorrect to say that Wife and defendant described their confrontation interchangeably except for its cause. They described two very different scenarios.

According to Wife, after an argument about the children's nutrition degenerated into name-calling, defendant hit her in the face with a thrown plastic cup, punched her forehead, slapped her cheeks, grabbed her shoulders, shook her, punched her again knocking her to the ground, stepped on her neck and back several times (or kicked her), dragged her by her hair (or neck and shoulders), and pushed her out a sliding door (or tried to). She denied hitting her head on the door.

According to defendant, after Wife punched their younger son, defendant approached her and questioned her intelligence, kneeled and blocked a kick aimed at their son, pushed her away, stood up and pushed her away again as she tried to kick them, grabbed her by the armpit and dragged her near the door, not succeeding in putting her out. Defendant denied punching or kicking Wife or pushing her into an object. To explain the photographed bruises on her forehead and right elbow, defendant suggested that she might have bumped into a counter or wall during their struggle. He also testified that she bruised easily, was clumsy and fell a lot, and was a dishonest person.

The legal premise of defendant's quoted argument is also flawed. Defendant is incorrect that all three elements of the "defense of others" would be established if the jury believed that Wife had punched the younger son on January 11, 2008.

As the jury was instructed, there are three elements of the defense of another defense:  (1) the defendant's reasonable belief that someone else was in imminent danger of suffering bodily injury or an unlawful touching, (2) the defendant's reasonable belief that the immediate use of force was necessary to defend against that danger, and (3) the defendant's use of no more force than reasonably necessary to defend against the perceived danger.

Assuming that evidence of Wife's propensity for violence would corroborate defendant's statements that he reacted because he believed his son was in imminent danger, that would tend to establish the first element of this defense.  And assuming that defendant's belief in the need for immediate force could be inferred from his conduct, that would tend to establish the second element.  But evidence of Wife's past conduct would shed no light on the third element of the defense, that defendant used no more force than was reasonably necessary.  Even if the jury believed defendant's testimony that he was motivated by a concern for the physical well-being of his younger son, the jury could have rejected the defense if it also found that defendant overreacted with the punches, slaps, stomps, and hair-pulling described by Wife.

Defendant did not argue at trial or in his new trial motion and we do not understand him to argue on appeal that the level of force that Wife described was justified either by her punching their younger son on January 11, 2008 or by her past violence toward their children.  In order to conclude that defendant used no more force than necessary, the jury would have had to disbelieve Wife's account of the altercation with defendant.  Evidence of her prior conduct would not have established the level of force that defendant employed.

Even assuming that the jury would not have discounted Mother's testimony based on her obvious bias in defendant's favor, Mother's proposed testimony and that of Donnelly at most would have partially corroborated defendant's version of the cause of the confrontation.  But it would not have required the jury to disbelieve Wife's version of

the confrontation itself. This new evidence would not have established a complete defense and it would not have directly contradicted Wife's testimony about the level of force defendant used. Given that the new evidence would only partly corroborate defendant and would not establish a complete defense, we see no reasonable probability that it would have affected the outcome.

### 4. Other New Corroboration of Defendant

On appeal, defendant contends that testimony from his mother and the older son's therapist would have corroborated his testimony in three ways.

### a. The Older Son's Statement to Mother

Mother stated in her declaration that the older son, then five, told her on January 11, 2008 that a fight had started that day between his parents when mommy kicked daddy.

If admitted into evidence, this would have been the third version of what the older son said about the events of January 11, 2008. Another version was what he gave to Officer Kim on January 13, 2008, that defendant slapped, punched, and kicked Wife and pulled her to the ground by her hair. At trial, he testified to yet another version, that he lied when he told the police that defendant hit Wife and that his parents did not argue.

Assuming the older son's statement through Mother was admissible as a prior inconsistent statement under Evidence Code section 791, and assuming the jury would have believed this third version of events that a fight started when mommy kicked daddy, as we have explained above, this would have only partly corroborated defendant regarding the start of the confrontation and would not have established a complete defense. We conclude that it is not reasonably probable that defendant would have obtained a better outcome had his mother told the jury about her grandson's third version of the incident.

### b. Defendant's Statement to Mother

Mother stated in her declaration that on January 12, 2008, defendant told her that he had confronted Wife the previous day because she punched their younger son.

As the Attorney General points out, section 791 would not authorize Mother to testify to this statement because it was the same thing defendant said at trial. Absent evidence of a prior inconsistent statement by defendant, this was not admissible as a prior consistent statement under section 791, subdivision (a). It was not admissible under section 791, subdivision (b) without a prosecutorial suggestion that defendant's testimony regarding the punch was recently fabricated. (Cf. *People v. Flores* (1982) 128 Cal.App.3d 512, 524.) The prosecutor argued that defendant was not to be believed, but not that his testimony was newly originated.

We do not see how it would significantly enhance defendant's credibility for the jury to hear his mother recalling him saying in January 2008 what he himself told the jury at trial. For defendant to repeat himself about the start of the confrontation would be only partial self-corroboration and would not have established a complete defense. It is not reasonably probable that defendant would have obtained a better outcome had his mother told the jury about his consistent description of the start of the confrontation.

### c. The Older Son's Statements to Donnelly

Defendant asserts that the older son had "consistently reported" to Donnelly that the incident happened as defendant described it and not as Wife described it.

According to defense counsel's summary of Donnelly's notes, the older son told her on June 11, 2010 that " 'Dad didn't do anything,' " on February 9, 2010 that " 'Dad didn't hit mom,' " and on November 18, 2009 that " 'Daddy & grandma didn't do the things mom says.' "

This was essentially consistent with the older son's trial testimony. In the absence of any intervening inconsistent statements by the older son, there would have been no basis for admitting these prior consistent statements.

## D. TRIAL COUNSEL'S INEFFECTIVENESS

In addition to arguing that the trial court should have granted defendant's motion for new trial based on trial counsel's ineffectiveness in failing to call defendant's mother and the older son's therapist as witnesses at trial, defendant directly raises the issue on appeal.

The ingredients of establishing that criminal trial counsel was constitutionally deficient are well known. First, counsel's conduct must fall outside the wide range of reasonable professional assistance. Second, the defendant must establish prejudice resulting from counsel's errors or omissions, namely, that there is a reasonable probability of a more favorable outcome in the absence of counsel's errors. A probability is reasonable when it is sufficient to undermine confidence in the outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 694; *People v. Bolin* (1998) 18 Cal.4th 297, 333; *People v. Vines* (2011) 51 Cal.4th 830, 875.)

Courts are restrained in reviewing the strategic decisions of defense counsel regarding which witnesses to call to testify, "unless the decision results from unreasonable failure to investigate." (*Bolin*, *supra*, 18 Cal.4th at p. 334; cf. *In re Hall* (1981) 30 Cal.3d 408, 427-428.) In this case, trial counsel has baldly confessed to having no strategic reason for failing to explore admissible grounds for calling either witness.

"[W]hen considering a claim of ineffective assistance of counsel, 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' (*Strickland v. Washington* [, *supra*,] 466 U.S. 668, 697.) A defendant must prove prejudice that is a '"demonstrable reality," not simply speculation.' [Citations.]" (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.)

We have already found in reviewing the trial court's denial of defendant's motion for a new trial no reasonable probability of a more favorable outcome had trial counsel sought admission of the additional witnesses' testimony on the theories now asserted by appellate counsel. It follows that defendant has not established the prejudice necessary to show constitutionally ineffective assistance of counsel.

## III. DISPOSITION

The judgment is affirmed. The petition for writ of habeas corpus is denied.

_____
Grover, J.

**WE CONCUR:**

_____
Rushing, P.J.

_____
Elia, J.